STATE OF NEW JERSEY BY WALTER D. VAN RIPER, ATTORNEY-GENERAL OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. ATLANTIC CITY ELECTRIC CO., DEFENDANT-RESPONDENT.

Argued October 22, 1956—Reargued December 3, 1956—
Decided January 21, 1957.

*Mr. David D. Furman,* Deputy Attorney-General, argued the cause for appellant (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney; *Mr. Charles J. Kehoe,* Assistant Deputy Attorney-General, on the brief).

*Mr. John Lloyd, Jr.,* argued the cause for respondent (*Messrs. Lloyd, Horn, Megargee & Steedle,* attorneys).

The opinion of the court was delivered by

WACHENFELD, J. This case adds another chapter to the large volume of litigation encountered in recent years relating

to the State's powers of escheat. Here, the subject of dispute is unclaimed deposits given by consumers to secure the defendant against nonpayment of charges for the services which it renders.

The Attorney-General commenced this action pursuant to the authority vouchsafed by *N. J. S.* 2A:37–11 *et seq.,* commonly referred to as the Fourteen-Year Personal Property Escheat Law. The complaint alleged the defendant, a public utility engaged in supplying electrical energy, had certain escheatable property within its possession and demanded a disclosure of its nature and amount. In reply, the defendant revealed it had received deposits from 4,356 customers in the aggregate amount of $18,416.44, which had remained unclaimed for 14 or more successive years previous to the institution of the State's suit. The defendant interposed an affirmative defense, however, claiming the applicable statute of limitations, *R. S.* 2:24–1, in force at the commencement of this proceeding, had barred the obtainment of any remedy by its obligees upon their choses in action and thereby negated the existence of any property rights escheatable to the State.

If the State had conceded the applicability of the six-year statute of limitations, it, of course had no alternative to admitting the validity of the defendant's argument and the corresponding futility of its own cause. *State by Parsons v. Standard Oil Co.,* 5 *N. J.* 281 (1950), affirmed 341 *U. S.* 428, 71 *S. Ct.* 822, 95 *L. Ed.* 1078 (1951). It was the State's view, however, that the relationship between the defendant and its customers concerning the monies deposited as security partook sufficiently of the nature of a trust to preclude the running of the statute of limitations, at least until demand for a return was made upon the company. 2 *Scott, Trusts* (1939 *ed.*), §§ 12.4, 219, 219.1.

The issue was joined upon stipulations in the pretrial order and an affidavit by defendant's secretary and assistant-treasurer stating the rules and practices which the company followed with respect to its requirement and treatment of security deposits.

After argument, the judge sitting below rendered an oral determination holding a contractual relationship of debtor and creditor within the purview of the statute of limitations existed between the defendant and the consumer-depositors, giving the defendant a vested right in its defense. *State by Parsons v. Standard Oil Co., supra.* We certified on our own motion while the appeal was pending in the Appellate Division.

The first issue is presented by the parties' differing interpretations of the record compiled below. The detailed statement of unclaimed consumers' deposits furnished by the defendant indicates that the subject deposits became inactive by disconnections of service through the years 1902 to 1934. Nevertheless, the State urges us to consider the issues as if the conditions surrounding the requirement of all the consumer deposits in litigation were governed by the regulations of the New Jersey Board of Public Utility Commissioners, adopted in 1928, and the "Terms and Conditions of Service" filed with that administrative body by the defendant. See *R. S.* 48:2–29.5 enacted in 1935.

We think the stipulations of the parties, the affidavit of the defendant's secretary and assistant-treasurer, and the oral determination by the trial judge conclusively establish a concession on the part of the defendant that these regulations and its own statement of "Terms and Conditions" were applicable.

Since under the adversary system of litigation the responsibility for the course which the proceedings take lies upon the contesting parties, we concur in the State's argument that the defendant should be bound by its representations and stipulations made at the hearing below. The defendant should not be permitted upon appeal to alter its interpretation of the facts upon which the issue was framed and which has legitimately been relied upon by the State in its conduct of the cause. 50 *Am. Jur., Stipulations,* § 9; 83 *C. J. S., Stipulations,* § 24.

The provisions of the utility regulations which the parties agreed were relevant to the controversy read as follows:

"Rule I. A water, gas or electric utility, where the credit of a customer is not established, may require a deposit reasonable in amount as a condition of supplying service. * * *

Rule VIII. Upon closing any account the balance of any deposit remaining after the closing bill for service has been settled shall be returned promptly to the depositor with interest due.

Rule IX. Interest at the rate of at least four per cent. per annum must be paid by each water, gas or electric utility on all deposits held by it to secure the payment of bills for metered service; provided that interest need not be paid if the service is short term or seasonal service."

In accordance with the regulations of the New Jersey Board of Public Utility Commissioners, the defendant filed its tariffs and its "Terms and Conditions of Service" governing the rendition of service to its customers, and these statements were accepted by the Board. The portion essential to the consideration of the appeal *sub judice* reads:

"Deposits.

A deposit may be required of the customer before service will be supplied. The company will pay interest on deposits so made at not less than such rate as may be required by the New Jersey Board of Public Utility Commissioners when such deposits are held by the company for a period of one year or longer. Retention by the company, prior to final settlement, of said deposit is not a payment or part payment of any bill for service. The company shall have a reasonable time in which to read and remove the meters and to ascertain that the obligations of the customer have been fully performed before being required to return any deposit."

Apparently, there are no regulations defining the status of the deposits in the hands of a utility. Compare expressions in *In re Rules Easton Gas Works*, 2 *N. J. Pub. Util. Rep.* 393 (1914), with those in *Case v. Boonton Electric Co.*, 4 *N. J. Pub. Util. Rep.* 568 (1916). It has been the defendant's invariable practice for many years to commingle such monies with its general funds. It has not maintained any physical segregation of the monies received as deposits from the remainder of its funds secured in the course of its business. When the obligation to refund such deposits accrued, the defendant made payment out of its general funds. When interest became due on any deposit, the source for its payment was the cash account of the company.

The State's initial contention is that the electric company sustained fiduciary obligations with respect to the monies received as security. It is too elementary to require citation as proof that a formal trust was never called into being, but the State asserts the relationship between defendant and the depositors is "more realistically a trust relationship * * * than debtor-creditor."

██ Whether a trust or a debt is created when one party pays money to another primarily depends upon their intentions. *State v. United States Steel Co.*, 12 *N. J.* 51 (1953). Frequently there is no explicit understanding as to the terms upon which the payee is to hold the funds, and then the nature of the transaction must be divined through consideration of the parties' behavior and the attendant circumstances. *State v. Western Union Telegraph Co.*, 17 *N. J.* 149 (1954); 1 *Scott, Trusts,* § 12.2 (1939 *ed.*); *Restatement, Trusts,* § 12, *comment g.* While no one element is necessarily decisive in light of the almost numberless variety of factual situations, there are certain essential principles which taken in conjunction control or vitally influence the interpretation to be given.

██ Probably the most important determinative of whether a debtor-creditor, as opposed to an informal trust, relationship is created lies in the provisions for the payment or nonpayment of interest. Where the recipient of money obligates himself to pay a fixed rate of interest, regardless of whether the money is invested and without reference to the rate of return which it yields, it is only reasonable to expect, unless a contrary intention is clearly manifested by some other circumstance, that the recipient is to have the beneficial as well as the legal interest. Presumably a debt, involving only a personal obligation to repay the amount received at the proper time, is established. When a fixed rate of interest is paid, as here, there is a strong inference that the payee is entitled to use the money to suit his own convenience. 1 *Scott, Trusts* (1939 *ed.*), § 12.2; *Restatement, Trusts,* § 12, *comment g.*

In *State v. United States Steel Co., supra,* an identical problem was presented with respect to sums deducted from

the wages of employees for the purpose of buying Liberty Bonds for which they had subscribed. We there held the statute of limitations had not run because the company acted as a trustee in exercising dominion over the funds collected for this specific purpose. Our opinion reflected the strong influence provisions for payment or nonpayment of interest have upon our understanding of the relationship involved. We found that the defendant held the funds in controversy in a fiduciary capacity because, among a congeries of other circumstances:

> "The company, under the arrangement agreed upon, was to pay no interest or other consideration to the employee on the funds retained and it was therefore not privileged to use the money for its general purposes. The employee who did not pay into the fund sufficient to purchase a bond was entitled to get back only the amount of his contributions, without interest." (12 *N. J.*, at *page* 59.)

The defendant in this case was directed to pay interest at the rate of four per cent without reference to its use of the funds or to the market conditions obtaining. This alone, though not controlling, is nevertheless strongly persuasive that the intent was to create a debt rather than a fiduciary responsibility.

██ Furthermore, the customs and usage of business are circumstances which may properly be taken into account in determining the effect of the transaction. *State v. Western Union Telegraph Co., supra.* At least since 1923 the defendant has commingled monies received as deposits with its general funds. Of course, the action of commingling undertaken unilaterally will not destroy a trust if it can be discerned that the parties intended otherwise. *State v. Western Union Telegraph Co., supra; State v. United States Steel Co., supra.* There is, however, in this case no indication that either the payor or the payee contemplated a relation of confidence. In most instances, the consumer who paid his deposit probably entertained no definite notion as to its legal status. We must, therefore, rely on the concrete manifestations of intent which are available rather than

depend upon obscure generalizations drawn from the chaos of individual experiences. Certainly, the company never implied by word or action that the funds which it received were to be separately maintained or dedicated to a specific purpose, another circumstance which in part refutes the establishment of an informal trust. *State v. Western Union Telegraph Co., supra; Povey v. Colonial Beacon Oil Co.,* 294 *Mass.* 86, 200 *N. E.* 891 (*Sup. Jud. Ct.* 1936); *Renshaw v. Tracy Loan & Trust Co.,* 35 *P. 2d* 298 (*Utah Sup. Ct.* 1934), modified upon rehearing, 87 *Utah* 364, 49 *P. 2d* 403 (*Sup. Ct.* 1935); *Old Colony Trust Co. v. Puritan Motors Corp.,* 244 *Mass.* 259, 138 *N. E.* 321 (*Sup. Jud. Ct.* 1923); *Tucker v. Linn,* 57 *A.* 1017 (*N. J. Ch.* 1904) (not officially reported); 1 *Bogert, Trusts* (1935 *ed.*), § 21; 1 *Scott, Trusts* (1939 *ed.*), § 12.2. Compare *National Surety Corp. v. Barth,* 11 *N. J.* 506 (1953).

The State cites paragraph 209 of the Uniform System of Accounts for Electric Light, Heat and Power Utilities, adopted by the Board of Public Utility Commissioners, as authority for the proposition that the defendant was under a duty to segregate funds received as deposits. The relevant portion of this regulation provides as follows:

"On and after January 1, 1915, every electric light, heat and power utility, as defined in Section I, Paragraph 15, of the above-mentioned statute, will be required to carry on its books the accounts herein prescribed or defined, in so far as the same are pertinent to the facts and circumstances of said utility, and to keep such accounts in conformity with the definitions and instructions contained herein. \* \* \*

209. Consumers Deposits.

Credit to this account all cash deposited with the accounting person or corporation by consumers as security for the payment of electric bills. Deposits refunded should be charged to this account and credited to 'Cash.' Deposits applicable to uncollectible or worthless bills should, at or before the close of the fiscal year, be credited to the account of the consumer involved and debited to this account."

We cannot agree that this section requires a physical segregation of sums received in the form of deposits. The purpose of a uniform system of accounts is to place utilities

in the State of New Jersey on a common footing with respect to accounting statements so that their financial positions can rationally be compared and contrasted. The classifications specified in the Uniform System of Accounts are designed only for the presentation in an orderly manner of the financial position of the companies involved and bear no relation to the actual disposition of the funds which they hold. We cannot infer a requirement for segregation from the mere fact that the defendant was required to show its outstanding liabilities on deposits separate from those of another nature. Suppose, for instance, the defendant was directed to distinguish its obligations on short-term and long-term notes in its balance sheet. Would we then say that the money received as loans from the payees on the notes should be segregated from the remaining funds in the possession of the company?

For the reasons already recited, prominent amongst which are the payment of a fixed rate of interest and the practice long continued without objection of commingling deposits with general funds, we believe the relationship *sub judice* was that of debtor and creditor. The individual consumer was not to retain any beneficial interest in the money deposited, the security arrangement obviously being solely for the benefit of the company. It accepted deposits without restriction as to use, incurring thereby the obligation of paying four per cent per annum. We can find here none of the circumstances which ordinarily engender the conclusion that a relationship embodying special confidence was intended. *In re the Harrisburg Gas Co.*, 38 *Pa. Dist. & Co. R.* 611 (*Pa. C. P.* 1940). *Cf. Pintsch Compressing Co. v. Buffalo Gas Co.*, 280 *F.* 830 (2 *Cir.* 1922); *Brooklyn Borough Gas Co. v. Bennett*, 154 *Misc.* 106, 277 *N. Y. S.* 203 (*Sup. Ct.* 1935); 6 *Williston, Contracts* (1938 *ed*), § 2033.

The State's final point is that the consumer-depositor had a cause of action based upon a liability imposed by law and not an action in debt upon a contract. Of course, a liability created by statute does not fall within the limiting provisions of *R. S.* 2:24–1, which reads:

"All * * * actions in the nature of debt, founded upon a lending or contract without a specialty * * * shall be commenced within six years next after the cause of any such action has accrued, and not thereafter. * * *"

Within their allotted sphere, the rules and regulations of a State administrative agency, duly promulgated under properly delegated powers, have the force and effect of law. 73 *C. J. S., Public Administrative Bodies and Procedure*, § 108. Thus, it is maintained by the State that the administrative "laws" quoted above remove the element of voluntary agreement in the making of deposits which is essential to the creation of a contract. All of the authorities cited by the State to support its position were carefully considered by Justice Burling in *Miller v. Board of Chosen Freeholders*, 10 *N. J.* 398, 414 (1952). It seems unnecessary to repeat at length the distinguishments there made for they are equally pertinent to the present case, where the rights of action of the depositors were not dependent on the administrative regulations themselves nor did they involve a "strictly statutory liability" unknown to the common law.

The administrative rules simply regulated the defendant in the enjoyment of powers which it had exercised for many years previous to their adoption. It was a common practice among utilities, and one not unknown in the general business world, to demand deposits as security and to pay interest thereon before the promulgation of the rules of the Board of Public Utility Commissioners. *E. g., Case v. Boonton Electric Co., supra.* Certainly, the liability of the defendant for the return of these deposits existed exclusive of the regulations. The proper rule appears to be that the running of the statute of limitations is suspended only when the liability is dependent solely upon statutory provisions. *E. g., Miller v. Board of Chosen Freeholders, supra; Fratt v. Robinson*, 203 *F. 2d* 627, 37 *A. L. R. 2d* 636 (9 *Cir.* 1953). For an illuminating discussion of the principle involved see *Schmidt v. Merchants Despatch Transportation Co.*, 270 *N. Y.* 287, 200 *N. E.* 824 (*Ct. App.* 1936).

Furthermore, the regulations in question do not dictate the terms of the agreement between the defendant and its consumer-depositors, although they do measure the rate of interest which must be paid. Rule I, previously set out, is entirely permissive in character. The subject utilities "may" require a deposit which is "reasonable in amount." Such a requirement, however, is not mandatory and the sum thereof is undetermined. Sufficient leeway remains for the exercise of discretion in arriving at terms so that it is not unrealistic to describe the relationship between the defendant and its customers as contractual, at least in so far as deposits are concerned. We are constrained to this view fully realizing that the defendant may have a monopoly within its area of service.

 The relationship, we must conclude, between the defendant and its customers with respect to their deposits was one of debtor-creditor, dependent for its existence upon a contractual understanding, and the relevant statute of limitations barred demand for the return of these deposits long before the initiation of the State's suit. Under these circumstances, there is nothing for the State to escheat.

Affirmed.

JACOBS, J., joined by VANDERBILT, C. J. (dissenting). For many years the Atlantic City Electric Company required that certain consumers (presumably transient residents) furnish security deposits in order to obtain service. Having no other choice they did so and in many instances later moved away without ever demanding the return of their deposits or so much thereof as remained after their final bills were marked paid. It would seem quite apparent that the consumers never thought of themselves as having made loans which would be barred by the running of the statutory period of limitations applicable to ordinary creditors. Indeed, the company itself never dealt with them as ordinary creditors. Thus, it maintained a segregated bookkeeping account to which it credited all consumers' deposits and carried them as outstanding liabilities without regard to time. If con-

sumers appeared (no matter how belatedly) and claimed the balances due on their deposits, they were invariably returned; and although the deposits were not physically segregated but went into the general funds of the company, those funds always exceeded the total amount of the deposits. In 1949 deposits which had remained unclaimed for 14 or more years aggregated over $18,000 and the State sought escheat under the terms of *N. J. S. 2A:37–11 et seq.* The court no longer views escheat proceedings with hostility; on the contrary in *State by Van Riper v. American Sugar Refining Co.*, 20 *N. J.* 286, 297 (1956), it recently pointed out that New Jersey's quest for legitimate revenues to be used for the good of all of its citizens is not to be condemned and that its right to escheat abandoned property must be recognized as superior to that of a corporation which has custody but no moral or legal right to its retention. See also *State by Parsons v. United States Steel Corp.*, 22 *N. J.* 341, 355 (1956); *State by Richman v. Sperry & Hutchinson Co.*, 23 *N. J.* 38, 43 (1956).

The Electric Company contends that its obligations to repay the security deposits constituted nothing more than ordinary debts which had been legally barred by limitations before the State instituted its action; if so, the State had nothing to escheat and the lower court's judgment was correct. See *State v. Western Union Telegraph Co.*, 17 *N. J.* 149 (1954). The State contends that the obligations were more in the nature of trusts (or pledges) which had not been legally barred by limitations; if so, the State was entitled to judgment below. See *State v. United States Steel Co.*, 12 *N. J.* 51 (1953). *Cf. Rusling v. Rusling*, 42 *N. J. Eq.* 594, 599 (*Ch.* 1887). The majority opinion properly sets forth that "whether a trust or a debt is created when one party pays money to another primarily depends upon their intentions." See 1 *Scott, Trusts* (*2d ed.* 1956), 104. But it then proceeds to find—despite the special and compulsory nature of the deposit and the actual conduct of the parties— that they intended simple loans which created debtor-creditor relations rather than something akin to trusts. It relies

on two facts: (1) that the deposits were never physically segregated but were mingled with the company's general funds, and (2) that the company had agreed to pay interest. As to the lack of physical segregation we need but refer to *State v. United States Steel Co., supra,* where Justice Wachenfeld soundly noted that "segregation of funds is only one of many factors to be weighed and considered in ascertaining the true intent of the parties" and that "failure to segregate the funds is not determinative of the conclusion that the relationship was debtor and creditor." In the instant matter a segregated bookkeeping account to which the deposits were credited was maintained by the company and the general funds into which the deposits were actually placed were always in excess of the aggregate deposits; these circumstances largely remove any weight which might otherwise attach to the lack of physical segregation. *Cf. Colantuoni v. Balene,* 95 *N. J. Eq.* 748 (*E. & A.* 1923); *Gutch v. Fosdick,* 48 *N. J. Eq.* 353 (*Ch.* 1891).

As to the agreement to pay interest it is, of course, a factor in determining the relationship between the parties but it is by no means dispositive. See *Gutch v. Fosdick, supra; Colantuoni v. Balene, supra. Cf. In re Newark Shoe Stores,* 3 *F. Supp.* 293 (*D. C. D. Md.* 1933); *People v. Pierce,* 110 *Cal. App. 2d* 598, 243 *P. 2d* 585, 590 (1952). In the *Gutch* case Chancellor McGill had no difficulty in finding a deposit to be a trust even though the defendant had agreed to pay 5% annual interest. And in the *Colantuoni* case the Court of Errors and Appeals unanimously approved an opinion by Vice-Chancellor Fielder which found that a deposit on which interest of 4¼% per annum was being paid was a pledge which the defendant could properly mingle with his other funds but could not place beyond his power to repay. In the instant matter the defendant's agreement to pay interest was part of the "Terms and Conditions of Service" filed by the Electric Company in accordance with the regulations of the New Jersey Board of Public Utility Commissioners. It provided that interest would be paid when the deposit was "held by the company for a period

of 1 year or longer"; that "retention by the company" before final settlement was not payment or part payment of any bill for service; and that the company was to have a reasonable time to ascertain the consumer's obligation before being "required to return" the deposit. As the court suggested in *People v. Pierce, supra,* the use of the foregoing expressions may be "significant and revealing"; debtors who borrow from creditors do not generally talk about the "retention" or "return" of the money "held" by them for their creditors. *Cf. Gutch v. Fosdick, supra,* 48 *N. J. Eq.,* at *page* 356:

> "Considered independently of the words 'in trust,' the word 'hold' implies a defensive possession, entirely consistent with that of a trustee. The declarant is to *pay* interest while he thus holds, but he is not to *pay* the principal sum; that he is to *refund.* The word '*pay,*' importing indebtedness, is applied only to the interest which springs from the use of the fund. When disposition of the fund itself is mentioned, the word '*refund*' is used in the sense of '*restore.*' I fail to perceive how more apt words could be selected to express the idea of a pure deposit in trust."

So far as the record discloses the consumers may never have seen the defendant's agreement to pay interest; and assuming they had they certainly would not have gathered from it that they were general creditors whose claims would be barred by limitations.

In *Pintsch Compressing Co. v. Buffalo Gas Co.,* 280 *F.* 830, 840 (2 *Cir.* 1922), the question presented was whether consumers who had made security deposits with the Buffalo Gas Company were entitled to priority on distribution in an equity receivership; the court, in holding that they were entitled to priority, justly declined to treat them as ordinary creditors. In *Brooklyn Borough Gas Co v. Bennett,* 154 *Misc.* 106, 121, 277 *N. Y. S.* 203, 219 (*Sup. Ct.* 1935), the court held that limitations would not start to run against security deposits until after the utility's consumers had actually demanded their return. Professor Williston has cited this case, along with others in different fields, for the principle that even "though a transaction is not strictly a trust since the person entrusted with money is not expected to keep it

as a separate *res,* there may, nevertheless, be such a continuing relation of confidence where money is delivered to be 'kept' as to prevent the Statute from beginning to run." 6 *Williston, Contracts (rev. ed.* 1938), 5704. It seems to me that whenever a consumer discovers that a utility has failed to return a security deposit which it no longer has any right to retain he should, in all equity and justice, be entitled to the deposit; whether he relies on the view that the relationship was in the nature of a trust which was not subject to limitations or on the alternative view that the continuing relationship of confidence prevented limitations from beginning to run, would seem to be immaterial. If he could prevail under either approach then the State, now standing in his stead, is likewise entitled to prevail. See *State v. United States Steel Corp., supra.*

Since I am satisfied, on the foregoing grounds, that the lower court erred in dismissing the complaint, I find it unnecessary to comment on the State's additional point that limitations were not at all applicable because the Electric Company's obligations to return the deposits—now long governed by regulations of the New Jersey Board of Public Utility Commissioners—did not arise in debt or contract but were imposed by law. See *Mayor, etc., of Jersey City v. Sackett,* 44 *N. J. L.* 428 (*E. & A.* 1882); *McFarlan v. Morris Canal and Banking Co.,* 44 *N. J. L.* 471 (*Sup. Ct.* 1882); *Outwater v. Passaic,* 51 *N. J. L.* 345 (*Sup. Ct.* 1889); *Smith v. Jersey City,* 52 *N. J. L.* 184 (*E. & A.* 1889); *Warren County v. Harden,* 95 *N. J. L.* 122 (*E. & A.* 1920). But see *Miller v. Board of Chosen Freeholders of Hudson County,* 10 *N. J.* 398 (1952). I vote to reverse.

*For affirmance*—Justices HEHER, OLIPHANT, WACHENFELD, BURLING and WEINTRAUB—5.

*For reversal*—Chief Justice VANDERBILT and Justice JACOBS—2.